And so I believe we come to United States v. Joseph Vadina. Is that correct? Yes, sir. And we've got four appellant. We have John Rhodes. And on the TV, we have Paulette Stewart, the AUSA. Is that correct? Good morning, your honor. Yes. Miss Stewart, can you hear me? Yes, your honor. Okay. And we can hear you and we can see you on our videos here. So we appreciate counsel. Go ahead. And you have ten minutes per side. Thank you, your honor. Good morning. I'm John Rhodes from the Missoula office of the Federal Defenders of Montana. I represent Joseph Vadina. I'm going to focus our argument this morning on two issues. First, on the consent to search issue, which we believe was not freely and voluntarily given, primarily because it was not unequivocal. Second, don't we have to find, though, that the district court clearly erred on this record, Mr. Roberts, in order to grant you relief on that issue? That is the standard of review, your honor. Which is a pretty tough standard to meet where the district court holds an evidentiary hearing and essentially credits the government witnesses and discredits your client. My client did not testify at the evidentiary hearing, and obviously the burden of proof is on the government. But we do have a factual finding that he essentially accepted the veracity of the agent's testimony, right? Yes. There's a few specific facts I would focus the court on that I believe show that the court clearly erred. First, we need to focus on the location of where the oral consent was given. My client lives in a remote part of Montana. He was picked up by the county sheriff, along with the deputy sheriff, who were in uniform, obviously with guns on their sides, took him in their squad car to an even more remote location, basically a non-residential, a forest area where it's surrounded by national forest. So is your argument that if consent is given in a rural setting, it's more coercive than if it's in an urban setting? Is that the point you're making? I believe that where it's in a rural setting, where they drive the person to that setting and waiting for him are four then INS, now ICE agents. And when he is questioned, you need to look at the facts of where everybody was located. He got out of the sheriff's car. How would that be different if it happened in the middle of the city of Los Angeles and they drove him around the corner and there were four additional LAPD officers waiting? The presence of other citizens makes it less coercive in that there's other people there keeping an eye on the government. If there are non-biased witnesses, you would urge that that would be more likely to be a less coercive setting? That would be one reason. It would also be, it would embolden my client to exercise his rights if there are other people present, because he doesn't feel like there's no one there that... What do we do with the district court's finding that your client was almost jovial in his interaction with the state and federal officers during this encounter? It didn't sound to me like he was particularly intimidated by the presence of all these law enforcement officers. We would attribute that to nervousness, reacting to a very serious situation by trying to somehow minimize it, and getting back to... If he was so nervous, why did he make the statement that if they deported him, he'd come back by kayak or bicycle? Is that nervousness, too? That's what he said to the officers. I don't know how to explain that. The district court credited that statement, did it not? Yes. In its factual finding? Correct. All right. But getting back to the location, when he was removed from the squad car, he was backed up against it, and then he was questioned by Agent Stablo, the lead ICE agent, and then there was basically a... Back behind the agent were a circle of law enforcement officers. So we believe right then and there that creates a coercive environment. Was there evidence in the record that your client knew the sheriff of the county? And I believe he knew the agent from a prior deportation, did he not? He knew the sheriff because this is a county where everybody knows the sheriff, and the sheriff knows nearly everybody. So doesn't that cut against your argument if he basically knows the at least local law enforcement officer that he's dealing with? Does that support the district court's finding that it was not a coercive consent? Not here because when the sheriff, we believe, seized my client and took him to this remote location, he had him empty his pockets. So this was not an encounter that you would have on the corner in town. This was obviously a law enforcement situation where they had my client empty his pockets, and then when he was brought to the remote location, it appears in the record that two of the agents had dealt with my client previously when he was deported in 1995, which again, we believe, creates a coercive environment. Getting beyond the location of the oral consent, when my client was asked to give written consent, he refused. And the law requires that his consent be unequivocal. And that's the weakness, and that's where there's clear error in the district court's ruling. Counsel, what's your best case to support your argument that failure to give written consent when there has been oral consent renders the consent involuntary? What case are you relying upon? Two cases, Your Honor. First, Lindsey from this circuit is a case where this circuit reasoned that because a defendant first gave oral consent and then later gave written consent and there was a time lag between the two, that reflected further voluntariness because the defendant in that case had time to think about it and proceeded to give the written consent. But do you have a case that says giving oral consent followed by failure to give a written consent vitiates that consent? No. And, in fact, this circuit ruled to the contrary in Castillo, but Castillo based its reasoning on a Fifth Circuit case, Bukater. And Bukater was very specific in its holding. And I'm going to read from the case. It says, quote, while the refusal to sign a waiver might cast doubt on the first oral consent, Bukater reiterated his consent after his refusal to put anything in writing, thereby clarifying his position after the search. Here, the oral consent was not reiterated. Basically, at that point, my client withdrew his consent. The agents perceived it as such because they went to speak to his sister. Well, did he withdraw the consent or did he simply try to put the agents off by saying, you know, my sister owns the property, so if you want to talk to the person with lawful title to the property, you'll have to ask her? That's a summation of what he said. He did not say, I'm withdrawing my consent. But how is that? I guess what I don't understand is how is that inconsistent with the finding by the district court that your client consented to the extent that he had a possessory interest in the trailer? Because the consent has to be unequivocal. And here he equivocated by saying you need to speak to my sister. I guess what I don't understand is why is that equivocal if he's saying, you know, look, it's okay with me, but you also have to ask my sister who owns the property. He didn't say put it that way. At first he said you can consent. They gave him the written consent. He said I'm not the person that has authority to do this. In order for us to find it equivocal, we have to find that it could go either way. And I can see it going one way, but I'm having a harder time going your way. We would point further to the videotape, which it was undisputed, and I believe you can accept as a matter of fact, that the agent said on the videotape we're doing this search pursuant to the consent of the sister. So even the agents felt at that point there was at least equivocation, and more pointedly a withdrawal of the consent by my client instead. A withdrawal of the consent or a corroborating consent from the sister? Well, as a matter of law, she didn't have authority to consent. So I don't think the court can look at it as a corroboration. And the district court didn't rely on the consent of the sister, did it? No, but the point is that's what the agents did in the video. They were saying we're here searching this trailer pursuant to the consent of the sister, showing that they believed that my client had at an extreme withdrew his consent or at least was equivocating. And as I say, as a matter of law, under this Court's ruling in Shibu, going back to a decision of Pace in the early 1960s, the consent has to be unequivocal. Mr. Stewart, it's up to you. You spend your time, but if you want to reserve rebuttal time, you've got two minutes left. I would, Your Honor. I would like to raise the sentencing issue. I filed two 28-J letters with this Court regarding the fact that my client has to be remanded for resentencing pursuant to the Booker remedy. The decisions of this Court are Moreno, Hernandez, and Ruiz, Alonzo, and each of those cases, which were also 1326 prosecutions. Regardless of other rulings in the case, this Court said that the proper sentencing remedy was to remand so the defendant could be resentenced pursuant to Booker. So we're requesting that relief regardless of the Court's ruling on the consent issue. I thought that Quintana, Quintana rejected a need for a need for a jury finding on a prior conviction. That's true, Your Honor. Here we're not dealing with the Sixth Amendment violation. You're saying that you want to have a discretionary judge who knows they have discretion? Yes, and I believe the Court has to do that consistent with Ruiz, Alonzo, and Moreno-Hernandez. Okay, thank you. We'll give you a minute for rebuttal. Thank you, Your Honor. And an extra minute. We'll give you two minutes for rebuttal. Now we'll proceed to Paulette Stewart. Good morning. May it please the Court. I am Paulette Stewart, Assistant United States Attorney from the Helena, Montana, Office for the Appellate. First, I'd like to address the sentencing issue. It's the government's position that the sentence should be affirmed because Vadina has not shown plain error. One of the main things he would, the objection, or actually there were no objections concerning sentencing, and finally, the defendant has not shown plain error. During the sentencing, the district court noted the factors in Section 3553A, which are punishment, protection of the community, deterrence, rehabilitation, offense conduct, and recidivism, when he sentenced the defendant to the low end of the guideline range at 27 months. And there were no objections to the sentencing guideline that the district court used. I don't believe the defendant has shown prejudice. Ms. Stewart, doesn't our response on this issue depend on what the Ninth Circuit does in bank on the Ameling case? Yes, Your Honor. I believe it does. So it might be that we should, that arguing on that one isn't going to be dispositive in contrast to, you know, our review of Ameling once it's finally rendered. And it might make sense to address the voluntariness or coercion issue. Pertinly, Your Honor. On the consent search, under the totality of the circumstances, Mr. Bedina did give a free and voluntary consensus search, and the defendant's false bravado argument is actually undermined by his conversation with his sister. After the agent receives numerous, yes, you can go ahead and search my trailer responses, from the defendant, he goes to get the consent form. The defendant says, doesn't say, no, I won't give you consent. He says, my sister owns the property, so she should be the one to sign the form. At no time does he say, no, you cannot search. I changed my mind. And he has a conversation with his sister, who then signs the consent form. So obviously he didn't say to the sister, don't sign the consent form. And at no time did the defendant, during the search or any time during this encounter, withdraw his consent. And so the findings by the district court is that we have a 51-year-old Slovakian national who's lived and worked in the United States for 33 years. He was transported to the meeting unrestrained. Only one agent talked to him, and during that time he was almost jovial. He admitted to his identity, to his status of being previously deported. He admitted to illegally reentering the United States. That's when the agent asked for permission to search for passport or other travel documents. The defendant replied, yes, go ahead, I have nothing to hide. When he was presented with the consent form, he said, my sister needs to sign that. And additionally, he complained about prior property being taken from him, and the sister signed it after having a discussion with him. And so it's the government's position that the district court was correct in finding that Mr. Villadena freely and voluntarily gave his consent to search. Ms. Stewart? Yes, ma'am. What's your response to opposing counsel's observation that on the videotape, the agents indicated that their opinion that the consent had been withdrawn? No, I don't believe that their opinion is that consent was withdrawn. I believe that the person who signed the consent form was the defendant's sister, and therefore, since she was the one that signed the consent form, that's who they said had given consent. I don't believe that that actually goes to a refusal or a revocation of the permission or the consent that Mr. Villadena had given. Under the legal standard, as I understand it, we look at the total circumstances. Is that correct? Yes, Your Honor. And it seems that the primary argument stressed by Mr. Rhodes for his client is the remote rural location. And it summons up images of something like that movie Miller's Crossing or whatever, where someone's taken to a remote crossing out in the boondocks and they're in danger. What does the record show about the reason or reasons, if there were any on the record, for moving a felon to a more remote location before asking him questions? No, Your Honor. I don't believe that the reasons are in the record. What the record does denote is that I believe the house they were cleaning is in a remote area. They transported the defendant approximately a half mile away from the house, and actually it's in a parking area on Highway 200, which Highway 200 is probably the most main street or main highway out in that area. And as defense counsel noted, that whole area is really pretty rural, including where the defendant's trailer was located. Additionally, after the initial discussion with Mr. Bedina at the parking area on the side of the highway, they actually went back to the house, had the discussion with Mrs. Lafreniere, before then going to the trailer, which I believe is even in a more remote area. So as far as remoteness goes, they actually had their conversation, or this encounter actually took place in probably one of the more traveled intersections or places that it could have been. Did the officers pick him up first at his trailer and then take him to the other location to meet with the other immigration people? No, Your Honor. The sheriff and the deputy picked up Mr. Bedina from the house where he was working or cleaning with his sister. Oh, I see. Okay. Okay. Thank you. That's all I have, Your Honors. So it was just the sheriff and his sergeant who made the initial contact with Mr. Bedina? Yes, Your Honor. Thank you, Mr. Rhodes. Thank you, Your Honors. Okay. We appreciate your argument. Mr. Stewart. Picking up on that last point, Your Honor, this was a dirt road off of the highway. Oh, I'm sorry. Mr. Rhodes. I said Mr. Thank you, Your Honor. I think I called him Mr. Roberts. Sorry. I've been called worse. You asked Judge Gould, the prosecutor, why did they take him to this location. We think it's clear. They wanted to intimidate him. They wanted to have a sheriff's squad car pick up somebody. Did you develop any evidence at hearing as to the motives of the officers? No, Your Honor. Unfortunately, I was on an assignment in D.C. at the time, so I wasn't in my office. So it sounds like just the record's silent except for what anybody could infer. Correct. But we would urge that you infer. We do know that the sheriff knew Mr. Bedina, so I guess from that we can infer that it wouldn't be unusual to send somebody who knows Bedina to make the initial contact. There's actually testimony to that fact. That's why they did that. We emphasize that they had him empty his pockets before he got in the squad car. So there is evidence in the record that the reason that the initial contact was made was because the sheriff knew Mr. Bedina. Yes, yes. And also they brought him to this remote location with four ICE agents there, two of which had been involved in his previous deportation. We would also note that it's on the record they had an arrest warrant for Mr. Bedina, so he was in custody. He wasn't going anywhere. I want to address the sensing issue. This case, pursuant to this Court's decisions in Ruiz and Moreno, isn't controlled by Ameline. Ameline's not mentioned in either of those decisions. In fact, it's somewhat surprising. Those decisions go through the analysis. But Ameline is pending before the Court now in Bank, and it's going to address these issues. Perhaps. I don't know if it's going to. And so is Judge Rawlinson. And Judge Rawlinson as well. Be careful how you proceed. The distinction is in Ameline, obviously, there was clearly a Sixth Amendment error. In the Ruiz and Moreno cases, there was not a Sixth Amendment error. There are 1326 cases, yet still this Court remanded for resentencing, pursuant to the Book of Remedy, without citing Ameline. So we believe on that basis this case has to be remanded regardless. Well, counsel, let me ask you this. Was the defendant sentenced to the very low end of the guidelines? Yes, Your Honor. Okay, so you're saying that the plain error was what? The plain error is that he was sentenced on what now is deemed an unconstitutional system. There are 3553A factors that we would have investigated and brought to the district court's attention. To what effect? To get a below-the-low-end-of-the-guidelines sentence. I would shoot for time served. My client, Mr. Medina, has lived in the United States for over 33 years. This is his home. In fact, he lived in Czechoslovakia. I understand. I just wanted to know what your argument was. Yes, that would be the thrust of our argument. And the Sixth Circuit in Barnett has reached that same holding regardless. See, we're fast time. Believe me, we know a lot about these sentencing issues. Maybe not as much as distinguished counsel on both sides, but we've really hammered them out in the Amalina and Bank process. Okay, well, thank you very much. Thank you, Your Honor. The case will be submitted, and United States v. Joseph Medina is submitted, and we appreciate the argument of both counsel. We now proceed to National Treasury Employees v. Federal Labor Relations Authority.
judges: Gould, Tallman, Rawlinson